[No. A039654. First Dist., Div. Five. Mar. 31, 1989.]

BRUCE BABER, Plaintiff and Appellant, v.
NAPA STATE HOSPITAL et al., Defendants and Respondents.

**COUNSEL**

John Houston Scott and Bruce H. Schwartz for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Marvin Goldsmith, Assistant Attorney General, Tyler B. Pon, Paul Hammerness and Theresa Tan, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**HANING, J.**—Appellant was nonsuited on his opening statement in his action against the State of California for injuries received while involuntarily hospitalized at Napa State Hospital. He contends, inter alia, the trial court erred in ruling he had not stated a prima facie exception under Government Code section 855, subdivision (a)[1] to the immunity conferred upon respondent by section 854.8, subdivision (a).

### FACTS AND PROCEDURAL HISTORY

On July 9, 1977, appellant was involuntarily hospitalized at Napa State Hospital as a gravely disabled conservatee under the Lanterman-Petris-Short (LPS) Act. (Welf. & Inst. Code, § 5000 et seq.) On that date he was attacked by two other patients, who forcefully subdued him and stabbed a pencil into his right eye, causing permanent loss of sight therein. His complaint alleged that respondent was negligent in placing him and the two patients who attacked him on the same ward (Ward A-5); failing to segregate violent from nonviolent patients; inadequately or insufficiently training Ward A-5 staff; insufficiently or inadequately supervising appellant and his attackers; providing inadequate security on Ward A-5; providing inadequate or insufficient medical facilities or personnel; failing to provide prompt medical treatment; and failing to provide adequate and sufficient equipment, facilities and personnel.

Appellant's trial brief and opening statement proffered the following facts:

Upon admission to the hospital as an LPS conservatee, appellant was placed on Ward A-5, the maximum high security ward. He was assigned there due to lack of available space on the San Francisco RAP ward, a ward for patients who were not violent, dangerous or acting out. On his fourth day at the hospital his treating physician noted in appellant's hospital chart that he should be transferred to the RAP ward as soon as a bed became available. The following morning he was attacked in the common bathroom by two patients known to be violent and dangerous.

In July 1977 Ward A-5 was understaffed. On several occasions prior to July 1977, Dr. Abraham Linn, executive director of the hospital, asked the State to close the hospital to additional admissions due to a shortage of staff, equipment and space. According to Dr. Michael O'Connor, just prior to his becoming executive director in October 1977, a licensing inspection was

---

[1] Unless otherwise indicated, all further statutory references are to the Government Code.

conducted by the State Department of Health Services. The inspectors prepared a "list of deficiencies" requiring a "plan of correction." In response to the inspections, Dr. O'Connor prepared a plan of corrections which he submitted to the State Department of Health Services. In his opinion, the hospital had inadequate staffing, particularly nursing and medical staffing, and inadequate facilities. Moreover, deficiencies in the physical plant raised certain safety issues. During 1977 the hospital was not accredited by the Joint Commission on Accreditation of Hospitals (JCAH). Dr. O'Connor attempted to improve patient safety from assaultive or violent patients by increasing staffing and providing additional training.

Hank Schoenlien, who participated in the 1977 inspection of the hospital, produced documents indicating that as a result of the 1977 inspection of all state hospitals, "each hospital was found to be out of compliance with federal Medicaid and state licensing requirements." In May 1977 a summary report prepared following inspections of all state hospitals, stated that all were out of compliance with federal standards and had numerous deficiencies, including nursing and physician services, physical plant, environment and safety. A resurvey of all state hospitals in August 1977 found staffing insufficiencies and the need for additional equipment.

Appellant's medical records state that the day preceding his injury he requested a telephone to call his mother or to file a petition for a writ of habeas corpus, but all telephones on the ward were out of service. Appellant's counsel argued that had a telephone been available, appellant would have contacted a patient's rights advocate who could have transferred him to a different ward at some time prior to the incident.

In summary, appellant contended respondent had not complied with required minimum standards for patient safety and welfare as established by the State Department of Health Services. Following opening statement and the opportunity to state additional facts, the court granted respondent's motion for nonsuit and entered judgment accordingly, from which this appeal is taken.

### DISCUSSION

█ When reviewing a nonsuit we apply a well established standard: "A nonsuit may be granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. [Citation.]" (*Cervantez* v. *J.C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198,

595 P.2d 975].) ■ While it is proper to make the motion for nonsuit and within the trial court's power to grant it immediately after the plaintiff's opening statement, a nonsuit at this stage is disfavored and should be denied where the statement is not plainly insufficient. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 416, pp. 417-418; see *Loral Corp.* v. *Moyes* (1985) 174 Cal.App.3d 268, 272-273 [219 Cal.Rptr. 836].)

Section 854.8, subdivision (a) provides broad immunity for public entities from all direct and vicarious liability for injuries caused by patients of mental institutions, or injuries to inpatients of such institutions. (See, e.g., *Buford* v. *State of California* (1980) 104 Cal.App.3d 811, 827 [164 Cal.Rptr. 264]; *Guess* v. *State of California* (1979) 96 Cal.App.3d 111, 119-120 [157 Cal.Rptr. 618].) It states, in pertinent part: "Notwithstanding any other provision of this part, except as provided in this section and in [section] . . . 855, . . . a public entity is not liable for: [¶] (1) An injury proximately caused by a patient of a mental institution. [¶] (2) An injury to an inpatient of a mental institution."

However, section 854.8, subdivision (a) immunity is expressly subject to the exception of section 855, subdivision (a), which provides: "A public entity that operates or maintains any medical facility . . . is liable for injury proximately caused by the failure of the public entity to provide adequate or sufficient equipment, personnel or facilities required by any statute or any regulation of the State Department of Health Services . . . prescribing minimum standards for equipment, personnel or facilities, unless the public entity establishes that it exercised reasonable diligence to comply with the applicable statute or regulation."

Sections 854.8 and 855 were enacted as part of a legislative scheme governing governmental liability and immunity commonly referred to as the California Tort Claims Act (§ 810 et seq.), following the California Supreme Court's decision in *Muskkopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457]. *Muskopf* held that the doctrine of sovereign immunity no longer shielded public entities from tort liability. The Tort Claims Act was drafted by the Law Revision Commission, and enacted pursuant to its recommendations. The commission's general recommendations to the Legislature stated, in pertinent part: "Public entities should be liable for the damages that result from their failure to exercise reasonable diligence to comply with applicable standards of safety and performance established by statute or regulation. Although decisions relating to the facilities, personnel or equipment to be provided in various public services involve discretion and public policy to a high degree, nonetheless, when minimum standards of safety and performance have been fixed by statute or regulation—as, for example, . . . the regulations of the State

Department of Public Health . . . there should be no discretion to fail to comply with those minimum standards." (Recommendations Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 816.)

Section 815.6 establishes the general policy of public entity liability for damages resulting from the failure to exercise reasonable diligence to discharge mandatory duties imposed by statute or regulation. It provides: "Where a public entity is under a mandatory duty imposed by an enactment[2] that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Section 855, subdivision (a) is a specific application of the general policy established in section 815.6. (Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) Liabilities and Immunities, § 4.34, p. 377.)

Regarding medical, hospital and public health activities, the Law Revision Commission's recommendations further state: "A public entity should be liable for an injury which results from the failure to comply with an applicable statute, or an applicable regulation of the State Department of [Health Services], which establishes minimum standards for equipment, personnel or facilities in public hospitals and other public medical facilities, unless the public entity establishes that it exercised reasonable diligence to comply with the statute or regulation. Although decisions as to the facilities, personnel or equipment to be provided in public medical facilities involve discretion and public policy to a high degree, nonetheless, when minimum standards have been fixed by statute or regulation, there should be no discretion to fail to meet those minimum standards. [¶] This recommendation will leave determinations of the standards to which public hospitals and other public medical facilities must conform in the hands of the persons best qualified to make such determinations and will not leave those standards to the discretion of juries in damage actions. Hence, public entities will know what is expected of them and will continue to be able to make the basic decisions as to the standards and levels of care to be provided in public hospitals and other public medical facilities within the range of discretion permitted by state statutes and regulations." (Recommendations Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) pp. 829-830.)

The approved Law Revision Commission Comment to section 855 states that the section "imposes liability upon a public entity operating or main-

---

[2] Section 810.6 states: " 'Enactment' means a constitutional provision, statute, charter provision, ordinance or regulation."

taining medical facilities where the public entity fails to comply with applicable minimum standards for equipment, personnel or facilities, unless the public entity establishes that it exercised reasonable diligence to comply. The minimum standards . . . may be established by statute or by regulations promulgated by the State Department of [Health Services]. [¶] Paragraph (c) makes clear that this section grants no authority to adopt or enforce regulations; such authority must be granted by some other statute." (See Cal. Revision Com. com., 32 West's Ann. Gov. Code, (1980 ed.) § 855, p. 435; Deering's Ann. Gov. Code, (1982 ed.) § 855, p. 349.)

The Legislature has authorized the Department of Health Services to promulgate regulations regarding the licensing of hospitals. (Health & Saf. Code, § 1275.)[3] Health and Safety Code section 1276 directs that the regulations adopted must "prescribe standards of adequacy, safety, and sanitation of the physical plant, of staffing with duly qualified licensed personnel, and of services, based on the type of health facility and the needs of the persons served thereby." No hospital may be licensed unless the state department finds that the premises, the management, the bylaws, rules and regulations, the equipment, the staffing, "both professional and nonprofessional, and the standards of care and services are adequate and appropriate . . . ," and that the health facility is operated in accordance with its rules and regulations. (Health & Saf. Code, § 1277.) Moreover, the department may suspend or revoke such license due to a violation of the licensing statutes or the rules and regulations enacted thereunder. (Health & Saf. Code, § 1294.)

A major purpose of the licensing and inspection statutes is to enable the Department of Health Services to promulgate rules and regulations providing standards of safety and sanitation of hospitals under its jurisdiction. (See *West Covina Enterprises, Inc.* v. *Chalmers* (1958) 49 Cal.2d 754, 760 [322 P.2d 13]; *People* v. *Rehman* (1967) 253 Cal.App.2d 119, 156 [61 Cal.Rptr. 65] [interpreting the purpose of Health and Safety Code section 1411, since repealed and reenacted as Health and Safety Code sections 1275 and 1276].)

As authorized by Health and Safety Code sections 1275 and 1276, the California Code of Regulations, title 22, section 71001 et seq.[4] establish regulations for licensing and certification of acute psychiatric hospitals.

---

[3] Health and Safety Code section 1275, provides, in pertinent part: "The state department shall adopt, amend, or repeal . . . such reasonable rules and regulations as may be necessary or proper to carry out the purposes and intent of this chapter and to enable the state department to exercise the powers and perform the duties conferred upon it by this chapter . . . ."

[4] Health and Safety Code sections 1275 and 1276 provide the "Reference" or "Authority" for the title 22 sections pertinent herein. " 'Authority' means the provision of law which permits or obligates the agency to adopt, amend or repeal a regulation" and " 'Reference' means the statute, court decision or other provision of law which the agency implements, interprets or makes specific by adopting, amending or repealing a regulation." (§ 11349, subds. (b) and (e).)

The regulations include: Section 71209 – "There shall be adequate space maintained to meet the needs of the [medical] service."

Section 71225, subdivision (c) – "A sufficient number of appropriate personnel shall be provided for the safety of the patients."

Section 71227, subdivision (a) – "There shall be . . . : [¶] (1) A telephone."

Section 71501, subdivision (a)(3) – The hospital's governing body shall "[p]rovide appropriate physical resources and personnel required to meet the needs of the patients . . . ."

Section 71621 – "A telephone shall be available for patient use."

Section 71641, subdivision (a) – "The hospital shall be clean, sanitary, and in good repair at all times. ▮ ▮▮▮▮ Maintenance shall include provision and surveillance of services and procedures for the safety and well-being of patients, personnel and visitors."[5]

▮ Appellant contends respondent violated these standards, and is liable under section 855. Respondent claims the standards are insufficiently "quantifiable" or objective to support liability under section 855. This may well render it more difficult for appellant to meet his ultimate burden of proof, but it does not support a nonsuit on his opening statement. The adequacy of the standards has been entrusted to the Department of Health Services, which has sole authority, and presumably the expertise, to establish minimum standards of operation for state hospitals. Health and Safety Code section 1276 states that standards should be created "based on the type of health facility and the needs of the persons served thereby." This implies an understanding by the Legislature of the necessity of creating standards flexible enough to meet the variety and changing needs of psychiatric hospitals and patient populations.

Whether the hospital failed to comply with the minimum standards or exercised reasonable diligence to do so are questions of fact, which cannot be resolved by the instant motion for nonsuit. Appellant has indicated he is prepared to prove the hospital was inadequately staffed and equipped

---

[5] Our enumeration herein of certain standards is not intended to be exclusive. However, appellant bears the burden of proving that a failure to comply with any particular standard is relevant to, or a proximate cause of, his injury.

during the period in question, and in violation of minimum standards mandated by the Department of Health Services. He should be given the opportunity to do so. For instance, there may be correspondence, directives, inspection reports or other official memoranda indicating more specifically what was required of the hospital during the relevant time period. There may also be industry standards which were understood to apply.

Whether the hospital exercised reasonable diligence to comply is a matter of defense for respondent to establish, and clearly cannot be resolved by the instant motion for nonsuit. By the same token, if the ultimate proof fails to demonstrate that the standards were sufficiently specific to reasonably put respondent on notice of noncompliance, appellant will not have met his burden.

Appellant also contends that in light of respondent's inability to produce various documents regarding staffing, JCAH accreditation, inspections, patient assignments and beds during the period relevant to the incident, we should determine as a matter of law that upon remand, the burden of proving compliance with the appropriate minimum standards will shift to respondent. (See *Morris* v. *Williams* (1967) 67 Cal.2d 733, 760-761 [63 Cal.Rptr. 689, 433 P.2d 697].) This issue is premature and is better handled on remand by the trial court.

In light of our disposition, it is unnecessary to consider appellant's remaining contentions.[6]

The judgment of nonsuit is reversed.

Low, P. J., and King, J., concurred.

Respondents' petition for review by the Supreme Court was denied June 28, 1989.

---

[6] Appellant argued additional theories of liability which would have been cognizable were he proceeding on a cause of action under 42 United States Code section 1983. (See, e.g., *Youngberg* v. *Romeo* (1982) 457 U.S. 307 [73 L.Ed.2d 28, 102 S.Ct. 2452]; see also *City of Canton* v. *Harris* (1989) 489 U.S. 378 [103 L.Ed.2d 412, 109 S.Ct. 1197]; *De Shaney* v. *Winnebago County* (1989) 489 U.S. 189 [103 L.Ed.2d 249, 109 S.Ct. 998].) However, no such cause of action has been pled, and we need not reach those contentions.